*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* N. M. BRETTSCHNEIDER, Minor.

UNPUBLISHED
April 7, 2022

No. 357318
Monroe Circuit Court
Family Division
LC No. 19-024914-NA

Before: GADOLA, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to his minor child, NMB, under MCL 712A.19b(3)(j) and (k)(*ii*). We affirm.

## I. FACTUAL BACKGROUND

Respondent and Andrea Brettschneider married in 2009, when they learned that Andrea was pregnant with respondent's daughter, NMB. During the marriage, respondent and Andrea lived with their daughter NMB, and Andrea's two older children from a prior marriage, SP and SP2. In October 2019, respondent filed for divorce. During the pendency of the divorce action, respondent remained in the family home. The trial court terminated respondent's parental rights to NMB on the basis of its findings that he sexually abused his stepdaughter, SP. During an adjudication trial that was delayed for more than 15 months because of COVID-19 pandemic restrictions, SP testified that when she was between the ages of 8 and 14, respondent sexually abused her on multiple occasions in the family's two homes and on family vacations in South Carolina. Respondent denied sexually abusing SP, and several friends and family members testified, among other things, that respondent was known to be a truthful individual. At the conclusion of the adjudicative trial, the trial court found that NMB came within its jurisdiction under MCL 712A.2(b)(1) and (2).

At the dispositional phase of the proceedings the parties offered additional testimony related to NMB's best interests. At the conclusion of the best interests hearing the court considered the evidence offered at the adjudication trial as well as the dispositional hearing, and found that petitioner had established the statutory grounds for termination by clear and convincing evidence, and that termination of respondent's parental rights was in NMB's best interests. This appeal followed.

## II. ANALYSIS

## A. JURY TRIAL REQUEST

On appeal respondent asserts that the trial court erred by denying his request for a jury trial at the adjudicative stage. We disagree. A trial court's decision whether to grant an untimely request for a jury trial is reviewed for an abuse of discretion. *In re Hubel*, 148 Mich App 696, 697-701; 384 NW2d 849 (1986). An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). This Court reviews de novo questions involving the interpretation and application of court rules. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "When called upon to interpret and apply a court rule, this Court applies the principles that govern statutory interpretation." *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020) (quotation marks and citation omitted). "Court rules should be interpreted to effect the intent of the drafter, the Michigan Supreme Court." *Id*. (Quotation marks and citation omitted). Further, clear and unambiguous language should be given its plain meaning and enforced as written. *Id*.

A party is entitled to a jury trial only at the adjudicative phase of a child protective proceeding. MCR 3.911(A); *In re Sanders,* 495 Mich at 405. Under MCR 3.911(B), a party who is entitled to a trial by jury may file with the court a written demand for a jury trial within "(1) 14 days after the court gives notice of the right to jury trial, or (2) 14 days after an appearance by an attorney or lawyer-guardian ad litem, whichever is later, but no later than 21 days before trial." The court may also "excuse a late filing in the interest of justice." MCR 3.911(B). In this case, respondent's jury demand was untimely and the interest of justice did not require the trial court to excuse the late filing.

In the summons and order to appear that accompanied the initial petition filed in December 2019, respondent was advised in writing of his right to a trial by jury and the requirement under the court rule that if he desired a trial by jury he must file a written request with the court within 14 days after receiving the notice, or 14 days after an appearance by an attorney, whichever is later, but no later than 21 days before trial. At the preliminary hearing on December 10, 2019, consistent with the requirements of MCR 3.965, the court orally advised respondent, again, that he had a right to a trial by jury and that he would be required to file a jury demand in a manner consistent with the requirements of MCR 3.911(B). At the conclusion of the December 10, 2019 preliminary hearing, respondent was provided an advice of rights form that again advised him of his right to a jury trial and the manner in which a demand was to be made. Respondent signed this document acknowledging its receipt. Further, the court requested that respondent's attorney review the advice of rights with his client.

On December 19, 2019, respondent was appointed substitute counsel. That same day, he was advised of the original scheduled trial date of March 2, 2020. The adjudication trial was thereafter adjourned and rescheduled multiple times. In late May 2020, the trial date was ostensibly scheduled for July 23, 2020. It was only at this point that respondent appeared to take any action. On June 16, 2020, he filed a demand for a jury trial. In this demand, respondent admitted that the request was untimely, but he asserted that the interest of justice required that he be granted a trial by jury. At a June 23, 2020 hearing, respondent once again admitted that the jury demand was untimely, but continued to assert that his motion should be granted in the interest

of justice. Finding respondent's position unpersuasive, the trial court denied the motion for a jury trial.

Thereafter, the adjudication trial was adjourned and rescheduled several times because of high COVID-19 infection rates, COVID-19 restrictions, and respondent's request that SP and NMB testify in person. After one of the last adjournments, respondent again filed a demand for a jury trial. Respondent argued that MCR 3.911 expressly allowed for the late filing of a jury demand so long as it was filed more than 21 days before trial. He then reasoned that in light of the most recent adjournment of the trial date, his demand was timely. At a January 19, 2021 hearing, the court denied respondent's motion for a jury trial and scheduled the bench trial for March 18, 2021. The adjudication trial ultimately began on that date, more than 16 months after the filing of the petition.

Considering the foregoing chronology, the trial court did not abuse its discretion when it denied, on two occasions, respondent's request for a jury trial. Applying the plain language of MCR 3.911(B), respondent's demands for a jury trial were untimely. Respondent was informed of his right to a jury trial and the proper method by which to preserve that right at the December 10, 2019 preliminary hearing. Then on December 19, 2019, respondent was appointed substitute counsel. On that same day, he was advised of the original scheduled trial date of March 2, 2020. Applying the plain language of the court rule, respondent could have filed a demand for a jury trial up to February 10, 2020. Respondent did not file a demand within the time prescribed and, accordingly, his later demands, filed on June 16, 2020 and November 30, 2020, were untimely.

Further, it is of no moment that the date of the adjudication trial was repeatedly adjourned. Respondent asserts on appeal that his last demand for a jury trial was timely because it was made more than 21 days in advance of the March 18, 2021 trial date. However, there is no support for respondent's suggestion that each time an adjudication trial is adjourned, the clock for filing a jury demand would restart such that a demand would be timely so long as it was made 21 days before the newly scheduled trial. Indeed, such an interpretation is inconsistent with the plain language of MCR 3.911(B) and would render nugatory nearly the entire court rule.

We also note that respondent conceded, on many occasions, that his demand for a jury trial was untimely. He cannot now advance a different theory. "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Holmes v Holmes*, 281 Mich App 575, 587-588; 760 NW2d 300 (2008) (quotation marks and citation omitted). That is, "[a] party cannot stipulate [to] a matter and then argue on appeal that the resultant action was error." *Id*. at 588 (quotation marks and citation omitted). To allow a respondent to assign "error on appeal [to] something that [he] deemed proper in the lower court" would "permit [a] respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

Respondent correctly notes that even if he failed to make a timely jury demand, the court may excuse the late demand "in the interest of justice." MCR 3.911(B). This is a discretionary decision and, after reviewing the record, we conclude that the trial court did not abuse its discretion when it declined to excuse the late request. Respondent made no mention of a jury trial within the requisite time. When he was given notice that the adjudication would be by bench trial in February 2020, he did nothing. NMB, whose well-being constituted the focus of this child protective

proceeding, had already waited an inordinate amount of time for finality due not only to emergency orders related to the COVID-19 pandemic, but also requested adjournments. The primary interests of NMB would not have been served had the trial court granted respondent an adjudication trial by jury. The interests of justice in this case did not weigh in favor of excusing respondent's late request for a jury trial. The need to move this case forward was sufficient reason to deny respondent's belated request, which would have precipitated yet another adjournment.

Additionally, the reasons proffered by respondent in furtherance of his claim that the interests of justice warranted excusing the untimely demand were not persuasive and, indeed, appear disingenuous. Respondent asserted that certain circumstances arose that gave rise to a belief that a jury trial was preferable to a bench trial. Respondent cited the filing of an amended petition, the addition of criminal charges, the severity of the allegations, and the potential consequences. However, as the trial court correctly noted, none of these were changed circumstances. All of the reasons respondent cited to explain his preference for a jury trial were not recent events. Indeed, these events had occurred more than six months before respondent filed his jury demands on June 16, 2020, and November 30, 2020. If the circumstances cited by respondent made it imperative that the adjudication trial be heard by a jury, it is unclear why respondent delayed so long to make the demand. His dilatory conduct belies his stated rationale. Respondent also argued that a jury trial would eliminate placing the trial court in the difficult position of being the decisionmaker in both his divorce action and the child protective proceedings. However, a jurist frequently presides over related matters for judicial economy and the convenient administration of justice.

Finally, respondent argues that his right to a jury trial was constitutionally preserved and this fact somehow rendered his demand inviolate. While in the criminal context the right to a jury trial is constitutional, it is a statutory right in child protective proceedings, which are civil in nature. *In re Sanders*, 495 Mich at 418 n 15. In civil cases, the right to a jury trial "shall be waived . . . unless demanded by one of the parties in the manner prescribed by law." Const 1963, art 1, § 14. In this case, as discussed earlier, respondent waived his right to a trial by jury by failing to timely request a jury, and the trial court did not abuse its discretion by denying his untimely request.

## B. JURISDICTION

Next, respondent challenges the trial court's assumption of jurisdiction over NMB. Because a preponderance of the evidence established statutory grounds for jurisdiction under MCL 712A.2(b), we find no error in this regard.

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). The adjudicative phase determines whether the trial court may exercise jurisdiction over the children. *Id.* To establish jurisdiction, the petitioner must prove by a preponderance of the evidence that a statutory basis exists under MCL 712A.2(b). *In re Long*, 326 Mich App 455, 459-460; 927 NW2d 724 (2018). A "preponderance of the evidence" means evidence of a proposition that when weighed against the evidence opposed to the proposition "has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

-4-

In this case, the trial court exercised jurisdiction under MCL 712A.2(b)(1) and (2), which provide that a court has jurisdiction over a child in the following circumstances:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

After reviewing the record, we conclude that the evidence supports the trial court's decision to assume jurisdiction over NMB under MCL 712A.2(b)(1) and (2). A preponderance of the evidence established that respondent's conduct subjected NMB to a substantial risk of harm to her mental well-being and showed that his home, by reason of criminality and depravity, was unfit for NMB.

Respondent contends that the trial court improperly assumed jurisdiction over NMB because SP's inconsistent account of the events rendered her allegations of sexual abuse less than credible, indeed fabricated. Respondent was given an opportunity to present this argument to the trial court, which found SP's statements that respondent sexually abused her to be more credible than respondent's testimony to the contrary. We will not disturb the trial court's evaluation of the trial testimony.

SP testified that respondent sexually abused her for several years when she was between the ages of 8 and 14. The trial court found this testimony credible and a preponderance of the evidence supports this conclusion. The court noted that SP was consistent and realistic in her recounting of the abuse and that she had never retracted her allegations. The court also found that SP's description of the abuse enhanced her credibility. For example, the court noted SP's testimony that when respondent abused her after he had been drinking, he was more aggressive. The court found that this type of detail would ring true and SP would be unable to relate such a detail absent experiencing it. The court found SP's demeanor consistent with someone who was telling the truth. Specifically, SP was not evasive and she repeatedly verbalized that she did not want to guess, so she declined to answer when unsure.

Addressing respondent's insinuation that the delay in reporting the abuse suggested fabrication, the court found that SP articulated a reasonable explanation for why she delayed reporting the abuse for years. SP testified that when she was younger, she did not understand that what was happening was wrong. As she grew older, she realized it was wrong, but at that point, she was reluctant to disclose the abuse because respondent told her that if she did, NMB would grow up without a father. SP testified that she finally exposed respondent because she was concerned for NMB's safety, noting that once her mother and respondent divorced, NMB would

be alone more frequently with respondent. The court also found no evidence that SP had been coached.

By contrast, the court found respondent less credible. The court noted that his testimony appeared more polished and prepared. It also noted that unlike SP, respondent had months to prepare with the aid of an attorney. Also, unlike SP, respondent never made himself vulnerable to being asked about prior, potentially inconsistent statements. The court noted that the first time respondent made any real statements was during his trial testimony.

The court also considered evidence corroborating SP's allegations of abuse. There was evidence that SP and Andrea, without having an opportunity to collude, both similarly disclosed one of respondent's particular sexual habits. In fact, respondent generally conceded that he acted similar to a manner described by both SP and Andrea. SP would have been unable to recount respondent's proclivities had she not experienced them first hand. Further, SP's brother, SP2, recalled seeing respondent enter SP's bedroom and, on one occasion, he saw SP and respondent on SP's bed, under the blanket. Further, the court noted that respondent had access to SP because Andrea worked the 12-hour night shift and she frequently took SP2 and NMB shopping while SP remained at home.

Contrary to respondent's position on appeal, the trial court did consider various inconsistencies in SP's statements. SP was forensically interviewed in December 2019, shortly after her initial disclosure to Andrea. SP also testified at respondent's February 2020 preliminary examination. Then, she testified at the adjudication trial. During trial, respondent repeatedly confronted SP with alleged discrepancies related to the nature of the abuse and when, to whom, and in what order SP disclosed the abuse. The court acknowledged the discrepancies, but was not persuaded that the inconsistencies rendered SP's entire testimony untruthful. The court concluded that the differences between SP's various statements were explainable, insignificant, or immaterial.

The court noted that between her statements, SP had time to reflect. The court also remarked that if SP testified regarding one event of abuse, this did not preclude the possibility that other events occurred. Finally, regarding alleged discrepancies between the forensic interview and the preliminary examination, the court noted that if it appeared that SP testified differently at the preliminary examination, it was because she was never asked a similar question during the forensic interview. In this regard, the court correctly recognized that questioning in a child-lead forensic interview is very different than in a court proceeding.

Specific examples of alleged inconsistencies were brought to the court's attention. For example, during her preliminary examination testimony, SP stated that she told everybody about the abuse on "December 7." Yet, based on other witnesses' accounts and a text message exchange, it is likely that SP first revealed the abuse to her friend DD, on either Monday, December 2, 2019, or Wednesday, December 4, 2019, and then to her mother, Andrea, on December 5, 2019. Respondent expended a great deal of effort establishing that SP's statements regarding when she told DD and Andrea about the abuse were inconsistent. The trial court, however, reasonably found that this discrepancy was irrelevant. What is more significant is that SP consistently stated that she first disclosed the abuse to DD, and then later to Andrea, and the disclosures were a day or two apart.

Respondent also attempted to establish that SP's allegations were fabricated because she allegedly embellished or inconsistently reported the type of abuse that transpired each time she was questioned about it. Respondent relies most heavily on evidence related to whether the alleged sexual abuse included anal sex. Respondent asserted that SP was fabricating the allegations because there was evidence that she disclosed an incident of anal sex to DD, but denied the same at trial. However, the evidence as a whole supports that it was more likely that DD was simply confused or mistaken.

SP testified at trial that the abuse involved vaginal sex, oral sex, digital penetration, and genital touching or rubbing. She denied that there was ever any incidence of anal sex. During her forensic interview, SP did not disclose that any anal sex had occurred. In an effort to impeach SP's testimony, respondent relied on the testimony of DD and Detective Peterson. DD testified at trial that SP had disclosed an event involving anal sex. Det. Peterson testified that DD told him the same thing when she recounted conversations between her and SP. Det. Peterson also opined that he would have expected SP to disclose such a significant type of abuse. Respondent argued that this discrepancy rendered SP unbelievable. The trial court disagreed. The court noted that SP had consistently described an incident occurring in the basement. In previous statements, and at trial, SP testified that respondent made her pull her pants down and get down on her knees. Respondent then got on his knees behind her and put his penis inside her. According to SP, when respondent pulled out and went back in, he hit her "butt," which caused her pain. Det. Peterson admitted that he never specifically asked SP at the forensic examination whether there was anal sex. He also admitted that when questioning DD, the child never actually used the term "anal sex." Although DD referenced anal sex during her testimony at trial, upon further questioning by the court, she clarified that SP told her that respondent "put it in her butt." Contrary to respondent's view, there is very little to support a finding that SP gave inconsistent statements in this regard. It seems more likely that a child witness was simply confused or mistaken.

The trial court also considered and rejected respondent's theory that SP had many reasons for why she would manufacture allegations of abuse. For example, respondent argued that SP was attempting to get him out of the house and better Andrea's position in the divorce. However, if this were true, it begs the question why SP did not make similar allegations much sooner, or even when respondent filed for divorce the first time, approximately six months earlier. It was also argued that SP made false allegations to garner attention from her mother and other adults. Respondent elicited testimony that SP lacked appropriate physical boundaries around adults. There was also testimony that SP began engaging in self-harm after she learned that SP2 received more attention from their mother after it was discovered that he was cutting himself. The trial court found that SP's behavior was more consistent with that of a child who had been traumatized by sexual abuse than a child simply seeking attention. In addition, as the trial court noted, SP's text messages preceding the disclosure suggest that she dreaded telling Andrea about the abuse. Had SP simply been attention-seeking, it is likely that she would have been more eager and willing to make her disclosures.

Respondent also suggested that SP was jealous of her half-sister, NMB. He presented some testimony that SP frequently treated NMB poorly. However, most of the evidence, even testimony from respondent's own witnesses, suggested that NMB, SP2, and SP had normal brother-sister relationships that included typical sibling rivalry.

The trial court's assumption of jurisdiction necessarily turned on the credibility of SP and respondent. The record demonstrates that the court carefully considered all of the evidence before concluding that SP was more believable. "A reviewing court must defer to the special ability of the trial court to judge the credibility of witnesses." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014). SP's testimony indicated that respondent engaged in multiple acts of sexual abuse over the course of several years, beginning when SP was seven or eight years old. Respondent's testimony showed that he did not appear to accept responsibility. Further, NMB had reached the age at which respondent's abuse of SP began. The potential for both physical and emotional harm to NMB was very real. Accordingly, the trial court did not clearly err when it found that a preponderance of the evidence supported its assumption of jurisdiction over NMB under MCL 712A.2(b)(1) and (2).

As a final note related to jurisdiction, respondent also argues that because criminal charges were dismissed against him, there was no longer sufficient evidence to support jurisdiction under MCL 712A.2(b). However, there is a significant difference between the standard of proof employed in a criminal matter and that applicable in a child protective proceeding. Criminal charges carry a different legal standard, proof beyond a reasonable doubt. This is a higher standard than the preponderance-of-the-evidence standard necessary for the assumption of jurisdiction in a child protective proceeding, or even the clear-and-convincing standard for finding a statutory basis for termination of parental rights. A jury ultimately might determine that the evidence is insufficient to establish guilt beyond a reasonable doubt, but that could not prevent a civil court from finding that termination of parental rights is appropriate. Contrary to respondent's assertion, a parent need not be criminally charged or convicted of criminal sexual conduct for MCL 712A.19b(3)(k)(*ii*) to apply. *In re Schadler*, 315 Mich App 406, 410; 890 NW2d 676 (2016).

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, respondent argues that he was denied the effective assistance of counsel. This Court applies criminal law principles to claims of ineffective assistance of counsel in child protective proceedings. *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Because respondent did not move for a new trial or a *Ginther*[1] hearing in the trial court, and because this Court denied his motion to remand, our review of this issue is limited to mistakes apparent on the record. *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016).

The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Effective assistance of counsel is presumed and respondent has a heavy burden to prove otherwise. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). To establish a claim of ineffective assistance of counsel, respondent "must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington,* 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "In order to demonstrate that counsel's performance was deficient, [respondent] must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, [respondent] must overcome a

---

[1] *People v Ginther,* 390 Mich 436; 212 NW2d 922(1973).

strong presumption that counsel's performance constituted sound trial strategy." *Riley*, 468 Mich at 140. Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). Respondent has the "burden of establishing the factual predicate for his claim." *Putman*, 309 Mich App at 248 (quotation marks and citation omitted). After reviewing the record, we conclude that respondent has not overcome the presumption that he received the effective assistance of counsel.

Respondent's claim of ineffective assistance is essentially related to a claim that trial counsel did not vigorously pursue evidence related to the physical condition of SP's genitals. Respondent represents that if SP's allegations of penile-vaginal penetration before puberty were true, it would have resulted in the cutting or tearing of the genitals that would still be visible during a physical examination, even years after the penetration. In support of this assertion, respondent relies on the affidavit of Dr. Stephen Guertin. Respondent now argues that counsel was ineffective because he failed to request the production of SP's medical records, he failed to obtain an independent medical examination of SP's genitalia, and he neglected to consult an expert who presumably would have testified consistent with Dr. Guertin's opinions. We find no merit to respondent's claims that he was denied the effective assistance of counsel.

Initially, respondent cannot establish that counsel was ineffective for failing to obtain SP's medical records. SP testified that the sexual abuse stopped in either the late summer or early fall of 2019, i.e., approximately three months before she disclosed the abuse to her mother. Because of the time that had elapsed, SP did not undergo a sexual assault examination. Moreover, at the time of trial, Andrea testified that SP had never undergone a gynecological examination. Therefore, even if trial counsel's failure to request SP's medical records fell below an objective standard of reasonableness, because there is no factual basis for concluding that any records would have documented the condition of SP's genitalia, there is no reasonable probability that counsel's failure to request the records made a difference in the outcome. Accordingly, respondent cannot establish that trial counsel's allegedly deficient performance in this regard prejudiced the defense.

Respondent also asserts that trial counsel was ineffective because he did not obtain an independent medical examination of SP's genitals. Respondent presupposes that an examination of SP would have been performed had trial counsel made the request. We disagree.

Respondent has provided no authority for the proposition that had he moved for an order compelling SP to undergo an independent medical examination, the trial court would have been reasonably likely to grant the motion. SP was not the subject of the petition. She was a witness. Respondent has provided no authority for the proposition that a child witness in a child protective proceeding can be compelled to undergo an intrusive medical examination of her genitalia at a respondent's request.

Neither of the parties has cited any authority from this jurisdiction directly on point. Respondent cites the following *criminal* cases from other jurisdictions: *State v Barone*, 852 SW2d 216 (Tenn, 1993); *People v Chard,* 808 P2d 351 (Colo, 1991); *People v Visgar*, 120 Ill App 3d 584; 457 NE2d 1343 (1983); *State v DRH*, 127 NJ 249; 604 A2d 89 (1992), and *State v Ramos*, 553 A2d 1059 (RI, 1989). Apart from the fact that these were criminal cases, none of the courts in these cases actually granted the defendant's request that the sexual assault victim undergo an

involuntary genital examination. Indeed, in every case cited by respondent, the court found that the defendant had not provided a compelling reason to force a minor child to undergo a gynecological examination.

It is unnecessary for us to consider the circumstances under which a court might be justified in compelling an involuntary and invasive medical examination of a child witness, because respondent has not established that an examination was warranted in this case, i.e., that an examination was likely to yield evidence affecting the outcome. Presumably, respondent believes that such an examination would have shown no damage to SP's genitalia, but that is pure speculation. Respondent represents that if SP's allegations of penile-vaginal penetration before puberty were true, it would have resulted in the cutting or tearing of the genitals that would still be visible during a physical examination, even years after the penetration. Respondent ignores, however, that Dr. Guertin acknowledged that although transections that occur in the prepubertal period are expected to persist, lesser hymenal tears do not persist. Indeed, partial tears can ultimately heal to the point where examinations later would be classified as normal. Further, healing to this degree would occur within four to five weeks. Considering Dr. Guertin's speculative and equivocal opinion, respondent has not demonstrated that there was any basis for compelling SP to submit to a physical examination. Accordingly, respondent cannot establish that counsel was ineffective by failing to request that a physical examination be ordered. Trial counsel is not required to file meritless or futile motions. *People v Fonville*, 291 Mich App 363, 384; 804 NW2d 878 (2011).

Next, respondent argues that counsel rendered deficient performance by failing to retain an expert witness to testify or advise counsel. However, there is no evidence of record that respondent's counsel did not consult an expert witness. Given that there was no evidentiary hearing on the matter and nothing in the record concerning what any witness's testimony might have been, there are no mistakes apparent on the record with respect to counsel's failure to call a witness. Further, with regard to what witnesses to call, it is generally "presumed to be a matter of trial strategy, and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009). A claim of ineffective assistance of counsel premised on the failure to call a witness is analyzed under the same standard as all other claims of ineffective assistance of counsel. *People v Jurewicz*, 506 Mich 914 (2020). Accordingly, a respondent "must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficit performance, there is a reasonable probability that the outcome would have been different." *Id*. (Quotation marks and citation omitted). As indicated above, respondent cannot meet the requisite burden.

Furthermore, there is no basis for concluding that any error regarding the failure to call an expert may have been outcome-determinative. This case did not present a battle of the experts. Rather, it presented a credibility dispute. Petitioner presented SP's testimony regarding respondent's sexual assault. Trial counsel repeatedly attempted to impeach that testimony through cross-examination of SP, examination of other witnesses, and argument. Various inconsistencies between SP's trial testimony, preliminary examination testimony, and her statements made during the forensic interview were highlighted. Despite these efforts, the court found SP to be a more credible witness than respondent. Without any indication as to how any expert may have assisted respondent, there is no basis for concluding that the failure to retain an expert was outcome-determinative.

Lastly, respondent suggests that at the very least, he was entitled to an adverse inference instruction. We disagree. In the context of jury instructions, an adverse inference is appropriate "only when (1) the evidence was under the [culpable] party's control and could have been produced; (2) the [culpable] party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available to the other party." *Pugno v Blue Harvest Farms, LLC*, 326 Mich App 1, 24; 930 NW2d 393 (2018) (quotation marks and citation omitted). This case does not involve the suppression or concealment of evidence of a physical examination, but rather the absence of a physical examination. Accordingly, an adverse inference instruction would not have been appropriate.

### D. BEST INTERESTS

Finally, respondent challenges the trial court's finding that termination of his parental rights was in NMB's best interests. We find no error.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts,* 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App at 129.

The trial court did not clearly err when it found that termination of respondent's parental rights was in NMB's best interests. Respondent does not specifically contest that there existed clear and convincing evidence to terminate his parental rights under MCL 712A.19b(3)(j) and (k)(*ii*). He instead assumes, arguendo, that he was "guilty of sexually abusing" SP, but argues that termination of his parental rights still was not in NMB's best interests. He notes that "it is a known and documented psychological and sociological fact that stepchildren are abused as much higher rates than biological children." Apparently, respondent suggests that NMB was not at risk of sexual abuse because she was his biological daughter. By implication, he suggests that only children not related by blood are at risk in respondent's care. We are shocked that respondent would proffer such an argument. In any event, that respondent could sexually abuse any child evidences a shocking lack of judgment, deviant personality traits and, at the very least, poor parenting skills. Further, if respondent could cross the line with respect to a stepchild, there is no guarantee that he would not cross this same line with NMB despite his reliance on statistical data to the contrary. As discussed earlier, a preponderance of the evidence supports that respondent sexually abused NMB's half-sister, SP. The trial court concluded that the extreme risk of harm posed to NMB by respondent's actions far outweighed any benefit in continuing a relationship with him. Further, respondent's denial of the abuse and evidence that the extended paternal family

would not protect NMB from respondent supports the trial court's conclusion that NMB would be at risk of harm in respondent's care.

There is also evidence that respondent and his extended family would not facilitate or encourage a healthy relationship between NMB and her half-siblings. During this case, the paternal relatives engaged in unauthorized contact with NMB through the messaging features of an on-line video game. The relatives made disparaging comments regarding SP and respondent found nothing inappropriate about this contact. Several relatives testified that they refused to believe that respondent had sexually abused SP. Based on this conduct, there is reason to believe that respondent and the paternal relatives would damage the fragile relationship between SP and NMB.

Respondent further argues that because NMB is in the care of her mother, termination of his parental rights was not warranted. Respondent contends that he could continue to have a relationship with NMB fully supervised by his ex-wife. "Indeed, a child's placement with relatives weighs against termination . . . ." *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). But while the fact that a child is living with a relative must be considered, a trial court may still terminate parental rights in lieu of placement with a relative if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court specifically and appropriately made no findings related to NMB's placement. Because a biological mother is not a "relative" as defined under MCL 712A.13a(1)(j), the trial court was not required to weigh the child's placement with Andrea against termination. *In re Schadler*, 315 Mich App at 413.

Ultimately, it is in a child's best interests to be raised by a caregiver who can keep the child safe from physical and emotional harm and who uses proper parental judgment. A preponderance of the evidence supports that respondent would put NMB at risk of abuse and that he is not a suitable caregiver. Accordingly, the trial court did not clearly err when it found that termination of respondent's parental rights was in NMB's best interests.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Michael J. Kelly

-12-